UNITED STATES of America,
Plaintiff, Appellee,

v.

Alex MARKLEY, Defendant, Appellant.

UNITED STATES of America,
Plaintiff, Appellee,

v.

Antonio SUARES, Defendant, Appellant.

Nos. 77–1209, 77–1210.

United States Court of Appeals,
First Circuit.

Argued Oct. 6, 1977.

Decided Dec. 16, 1977.

Allen R. Rosenberg, Boston, Mass., with whom Robert M. Schwartz and Putnam, Bell & Russell, Boston, Mass., were on brief, for appellants.

James E. O'Neil, Asst. U.S. Atty., Boston, Mass., with whom Edward F. Harrington, U.S. Atty., Boston, Mass., was on brief, for appellee.

Before COFFIN, Chief Judge, CAMP-BELL, Circuit Judge, and CRARY, District Judge.*

CRARY, District Judge.

This consolidated appeal is from convictions on Counts 2 to 9, inclusive, of the Indictment charging appellant Markley with one count (Count 2) of possessing an unregistered destructive device in violation of Title 26, U.S.C. § 5861(d), and four counts of transferring an unregistered destructive device in violation of Title 26, U.S.C. §§ 5812, 5861(d), 5861(e), and Title 18, U.S.C. § 2.

Appellant Suares was found guilty of three counts of possessing an unregistered destructive device and three counts of transferring an unregistered destructive device.

Count 1, which charged conspiracy of the defendants to maliciously attempt to damage and destroy vehicles used in interstate commerce by means of an explosive, was dismissed following trial.

Motion for judgment of acquittal and to dismiss for insufficiency of the evidence was denied. In addition to asserting insufficiency of the evidence, appellants contend that the statute (26 U.S.C. § 5845(f)(1)) is unconstitutionally vague and that the trial court erred in that (1) it did not instruct the jury that a destructive device must be highly destructive and dangerous, (2) it failed to instruct as to a definition of "bomb" and gave instructions which equated "explosive" with "explosive bomb", (3) it failed to instruct that a destructive device must have the capability to cause destruction, and (4) it failed to give an instruction properly defining "explosion" and "explosive."

The appellants have stipulated that they possessed and transferred the devices as charged.

The four devices involved, one delivered November 7th and three on December 8th, 1975, and the exemplars constructed by the Government for testing purposes, were cardboard tubes approximately 4.5 inches in length, 1.5 inches in diameter, containing 3.5 to 4.5 ounces of commercially manufactured black powder with a small amount of toilet tissue as a filler, followed by cardboard discs. The ends of the tubes were sealed with paraffin wax. In one end was affixed a fuse.

The first device, received by the Government's undercover agent, O'Reilly, from appellant Markley on November 7, 1975, was tested at Fort Devens on November 10, 1975. The three devices delivered to O'Reilly by Suares on December 8, 1975, were dismantled by the Government on December 10, 1975. Each of these three devices, when received, were wrapped with black friction tape covering their entire length. The exemplars of these three devices as constructed by the Government, were tested.

Eleven tests in all were made involving the first device delivered and the exemplars, which were made for testing purposes.

Professor Emmons, appellants' expert, conducted tests on February 10, 1977, and

* Of the Central District of California, sitting by designation.

viewed the moving pictures of the tests made by the Government previous thereto and concluded that if such devices were fired in the open against the outside of a car or house it would only scorch the paint and that such devices would not produce a violent explosion or bursting and that they were not highly destructive devices. In one of Professor Emmons' tests conducted in the open, ignition resulted in a fire ball of eleven cubic feet. Another firing caused the top of a trash barrel to fly 25 to 30 feet in the air although the barrel and top were not damaged.

The tests conducted by the Government expert, Ralph Cooper, Explosive Enforcement Officer from the Bureau of Alcohol, Tobacco and Firearms, in November, 1976, varied in their destructive aspects. Firing of an exemplar in the open resulted in minimal damage. Cooper testified that "the blast pressure wave" caused by the ignition of an exemplar in the front seat of the cab of a Ford pickup truck with windows and doors closed, blew out the windshield with sufficient force to propel it about six to eight feet in front of the truck where it fell to the ground and broke. This test resulted in a report, fire ball engulfing the cab and a searing of the front seat where the device had been placed. One of the exemplars was placed under the hood of the Ford pickup on the engine block where it produced a fire ball but did not do any discernible damage.

In another test by Cooper, an exemplar was ignited inside the filler pipe attached to an empty gas tank. The filler pipe burst and the gas tank was bulged by the explosion. Cooper gave it as his opinion that if there had been a gas-air mixture in the tank it would have created a vapor explosion which would have ruptured the gas tank.

Mr. Cooper testified that in his opinion the subject devices were explosive bombs, that they contained an explosive black powder, had a delay explosive firing train (fuse) and were designed and constructed as weapons capable of producing damage to vehicles. He also said that the black powder was "an explosive and it's designed to be exploded."

Neither the appellants nor the Government disputed the facts as to each other's tests.

The Government undercover agent, O'Reilly, testified that on or about November 7, 1975, a Union organizer, appellant Markley, told him of a strike in progress at the Worthington plant in Holyoke, Massachusetts, and asked him to take care of a couple of trucks belonging to Martin Brothers Trucking Company, which had been giving the Union trouble. Markley gave O'Reilly a bomb to test, and after the test was made at Fort Devens O'Reilly told Markley that the device would not do.

Several times after the strike was over O'Reilly met with Markley and discussed other devices. On November 28, 1975, O'Reilly met both appellants and drove with them for several hours stopping at bars and package stores and during that time discussed the strike, and Markley said he still had in mind blowing up two of Martin Brothers trucks. O'Reilly offered to do that for $300 but nothing further developed on that subject. O'Reilly was wearing a body recorder and the conversations were recorded.

On December 5, 1975, O'Reilly telephoned Markley stating he had a job out Markley's way and needed three of the type of devices Markley had given him before, each to be double taped with different length fuses. He told Markley he was willing to pay $25 a piece. The three devices, assembled and intact, were delivered to O'Reilly by appellant Suares on December 8, 1975, on payment of $75.

The parties agreed that the crucial question of fact for the jury's determination was whether the devices involved were destructive devices within the meaning of 26 U.S.C. § 5845(f).[1]

---

1. Section 5845(f), Title 26, in relevant part provides:

"The term 'destructive device' means (1) any explosive, incendiary, * * * (A) bomb, (B)

■ In testing the sufficiency of the evidence from which a jury could find guilt beyond a reasonable doubt, the rule is well established that the view most favorable to the Government shall be taken. *United States v. Leach*, 427 F.2d 1107, 1110 (1st Cir. 1970).

Congressional history indicates that, to stem traffic in dangerous weapons, Congress passed the Omnibus Crime Control and Safe Streets Act, P.L. 90–351, in June, 1968, which amended the criminal provisions as to firearms, Title 18, U.S.C. § 921, *et seq.* The provisions of Public Law 90–351 were not satisfactory and in October, 1968, Congress passed the Gun Control Act, P.L. 90–618, further amending Title 18, U.S.C., and revising the National Firearms Act, 26 U.S.C. § 5801, *et seq.* "Destructive Devices" were included under "firearms" for the first time in the Crime Control Act, P.L. 90–351, and, somewhat redefined, were included in the provisions of both Title 26, U.S.C. § 5845 and Title 18, U.S.C. § 921.[2] The legislative history of Public Law 90–351 refers to highly destructive devices, pages 2167 and 2199, legislative history footnote 2. However, destructive devices are not referred to in the legislative history of P.L. 90–618 as highly dangerous or destructive.[3]

It is also to be noted that neither "highly" nor any other modification of "destructive device" is used in the legislation defining destructive device in either Section 5845(f) of Title 26 or Section 921(a)(4) of Title 18.

It is the Government's contention that the devices in the case at bench are "explosive bombs" and the Court instructed the jury that was the issue for its determination.

In *United States v. Posnjak*, 457 F.2d 1110, 1116 (2nd Cir. 1972), the Court held that Section 5845(f)(1) applied to only military ordnance or gangster type weapons, observing that Congress was concerned in the National Firearms Act with weapons which were the cause " * * * of increasing violent crime and which had no lawful uses and the intent of the user of these weapons was irrelevant as they were so prone to abuse that they were considered per se dangerous and unnecessary for legitimate pursuits."

In the case at bench the Court instructed the jury that they were not to consider the intent of the defendants as to the intended use of the devices involved, in determining the issue of whether they were dangerous within the terms of the statute.

This Court, in *United States v. Curtis*, 520 F.2d 1300 (1st Cir. 1975), adopted a broader interpretation of the statute than that of the Court in *Posnjak, supra.* Two devices were involved in the *Curtis* case. The one held to be a destructive device was described as "consisting of approximately eight to ten sticks of dynamite bound together and with a black box bound to them."

The conviction of the defendants of possession of the above described unregistered firearms was affirmed.

The Court, after quoting the pertinent portions of Section 5845(f), which defines "destructive device," discusses cases involving the issue and then says:

"The statutory purpose would be ill-served by an interpretation which excluded from coverage 'home-made' bombs have no lawful use simply because one of the components was dynamite, a material

grenade, * * * (F) similar device; (2) any type of weapon by whatever name known which will, or which may be readily converted to, expel a projectile by the action of an explosive or other propellant, * * * (3) any combination of parts either designed or intended for use in converting any device into a destructive device as defined at subparagraphs (1) and (2) and from which a destructive device may be readily assembled. The term 'destructive device' shall not include any device which is nei-

ther designed nor redesigned for use as a weapon; * * * ."

**2.** Volume 2, U.S. Code Cong. and Admin. News, 90th Congress, 2nd session, 1968, p. 2112.

**3.** Volume 3, U.S. Code Cong. and Admin. News, 90th Congress, 2nd session, pp. 4410 to 4435. The House bill was passed in lieu of the Senate bill.

not in itself regulated as a firearm. Thus, while gasoline, bottles and rags all may be legally possessed, their combination into the type of home-made incendiary bomb commonly known as a Molotov cocktail creates a destructive device." [Citations omitted.] p. 1304.

In the case of *United States v. Ross*, 458 F.2d 1144 (5th Cir. 1972), a molotov cocktail,[4] a home-made device, was held to be a "destructive device" under Section 5845(f).

The Ninth Circuit, in *United States v. Peterson*, 475 F.2d 806, 810 (9th Cir. 1972), in affirming a defendant's conviction of violation of the Firearm's Act, stated:

"We have concluded from a perusal of the legislative history of the act that Congress * * * intended to foster law and order among the public by the proscription of original and converted military type weapons and, also, the do-it-yourself type of similar devices and weapons of crime, violence and destruction."

The Court was there concerned with a home-made incendiary device, consisting of a casing 3 to 4 inches long filled with fuel material containing black powder and likened by the Court to a molotov cocktail. See also *United States v. Morningstar*, 456 F.2d 278, 280–281 (4th Cir. 1972); and *United States v. Oba*, 448 F.2d 892 (9th Cir. 1971).

■ We conclude that there was sufficient evidence to support a jury finding that the home-made devices in this case are destructive devices having no legitimate social purpose and fall within the provisions of Section 5845(f) regardless of their intended purpose.

### Is Section 5845(f) unconstitutionally vague?

■ The need for adequate warning by the terms of Title 26, U.S.C. § 5845(f), that the devices in question fall within the provisions of that statute, is well established.

The statute would be void for vagueness if it does not delineate the conduct it prohibits.

This Court, in *Goguen v. Smith*, 471 F.2d 88, 95 (1st Cir. 1972), in holding "treats contemptuously," referring to treatment of the flag of the United States in public, to be too vague, stated that among the well established principles upon which the void for vagueness doctrine is predicated is one that no person shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed. That case also holds that criminal statutes should be definite enough to obviate arbitrary enforcement.

The Supreme Court in *Jordan v. De-George*, 341 U.S. 223, 231–232, 71 S.Ct. 703, 708, 95 L.Ed. 886 (1951), said, with respect to vagueness:

"The test is whether the language conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices."

The Court there held the phrase "crime involving moral turpitude" did not lack sufficient definite standards.

In *United States v. Harriss*, 347 U.S. 612, 74 S.Ct. 808, 98 L.Ed. 989 (1954), the Supreme Court says:

"The underlying principle is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." p. 617, 74 S.Ct. p. 812.

In considering the question of whether the statutory definition of "destructive device" is unconstitutionally vague, the Court, in *United States v. Morningstar*, 456 F.2d 278 (4th Cir. 1972), held that there was no merit to that argument, stating:

"Nor do we find merit in Morningstar's plea that the Gun Control Act of 1968 is too vague to satisfy the requirements of due process. Questions about the Act's definitions arise only when resort is made to legislative history for the purpose of

4. A molotov cocktail is defined in Webster's Third New International Dictionary as "a crude hand grenade made of a bottle filled with flam- mable liquid (as gasoline) and fitted with a wick or saturated rag taped to the bottom and ignited at the moment of hurling."

528

limiting the accepted meaning of simple and well known words. On its face, the definition of a destructive device gives fair notice to a person of ordinary intelligence that it includes any combination of parts intended to be used as a bomb or weapon and from which a bomb or weapon can be readily assembled. See *United States v. Harriss*, 347 U.S. 612, 617, 74 S.Ct. 808, 98 L.Ed. 989 (1954)." p. 281.

The Court of Appeals vacated the order of the District Court dismissing the Indictment, which charged the appellee with possession of a destructive device, and remanded the case for further proceedings, ruling that four sticks of black powder pellet explosive fastened together with electrical tape and several unattached blasting caps could constitute a "destructive device" as a combination of parts intended for use as a bomb and from which a bomb could be readily assembled.

The Fifth Circuit considered the vagueness issue as to "destructive devices" defined in Section 5845(f), in *United States v. Ross, supra,* 458 F.2d 1144 (1972), holding:

"With reference to a Molotov cocktail, the part of the definition of 'destructive device' that refers to '(B) grenade * * or (F) similar device' is not so vague as to be outside the constitutional requirements that a person of reasonable intelligence be forewarned what is prohibited. [Citations omitted.] Section 5845(f) itself contains the crucial limitation that a destructive device does not include any device not designed or redesigned for use as a weapon. A Molotov cocktail has no use other than as a weapon, and a person may be charged with knowledge of its similarity to a grenade." p. 1145.

There is no evidence in the case at bench to, in any way, indicate that the devices here had any use in support of a social value.

■ We conclude that the defendants dealing in the devices here involved were well aware of their destructive propensities and that these devices had no legitimate social purpose. Section 5845(f)(1) provides

adequate notice that the devices would be included within the term "explosive, * * (A) bomb, * * * or (F) similar device," and a person of ordinary intelligence would be so aware in the circumstances of this case.

*Jury Instructions*

At the bench conference following the Court's instructions to the jury, appellants' counsel objected to the failure to give their instruction No. 18 which instructs that the devices " * * * must be explosive bombs or be similar to an explosive bomb" and must be highly destructive devices.

■ The Court did instruct the jury that it had to determine whether the devices were explosive bombs, stating: "Thus, unless you find beyond a reasonable doubt that the devices in question are explosive bombs in and of themselves, you must find each defendant not guilty of the charges in this particular case." The Court was not required to instruct the jury that the devices must be highly destructive to be destructive devices within the statute.

■ Counsel at the bench also requested the Court to instruct the jury that "just because it is an explosive it is not an explosive device." After full consideration of the instructions given by the Court relating to "explosive", "explosion" and explosive device, we conclude the jury was adequately instructed on appellants' theory of their defense and that there was no reversible error in not complying with appellants' request.

■ Appellants, for the first time on appeal, cite as error the Court's failure to define "bomb." We conclude that not giving such an instruction is not clearly erroneous when all of the Court's instructions as a whole, are considered.

*The convictions are affirmed.*

The judgments are ordered corrected to set forth the Code sections, the violations of which the appellants were convicted as follows:

The judgment of conviction of defendant Alex Markley is corrected by striking "Sections 1561(d), 1561(e)" and substituting in the place and stead thereof, "Sections 5861(d), 5861(e)," the latter two sections being those of which the defendant Markley was indicted and convicted.

The judgment of conviction of defendant Antonio Suares is corrected by striking "Sections 1561(d), 1561(e)" and substituting in the place and stead thereof, "Sections 5861(d), 5861(e)," the latter two sections being those of which the defendant Suares was indicted and convicted.

The judgments as so corrected shall be in full force and effect.

*The judgments as corrected are affirmed.*