**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**David JOHNSON, Defendant–Appellant.**

**No. 97–2599.**

United States Court of Appeals,
Seventh Circuit.

Argued April 9, 1998.

Decided July 31, 1998.

Laura A. Przybylinski (argued), Office of the United States Attorney, Madison, WI, for Plaintiff–Appellee.

T. Christopher Kelly (argued), Thomas, Kelly, Habermehl & Wood, Madison, WI, for Defendant–Appellant.

Before CUMMINGS, CUDAHY and RIPPLE, Circuit Judges.

RIPPLE, Circuit Judge.

David Johnson was charged in an indictment with possession of two unregistered firearms in violation of 26 U.S.C. § 5861(d) and with unlawfully manufacturing two firearms in violation of 26 U.S.C. §§ 5822 and 5861(f). The jury returned a verdict of guilty on the possession charge but was unable to reach a verdict with respect to the manufacturing charge. A judgment of conviction on the possession charge was entered by the district court on April 17, 1997, and Mr. Johnson was sentenced to thirty months in prison. He now appeals. For the reasons set forth in the following opinion, we affirm the judgment of the district court.

## I

## BACKGROUND

### A. Facts

In the summer of 1996, David Johnson was employed as a maintenance person at a Shopko store in Hallie, Wisconsin. On the morning of August 4, 1996, Mr. Johnson summoned Lynn Hinkens–Johnson, an assistant store manager, to the toy department. He said that there was something he wanted to show her. Mr. Johnson directed Hinkens–Johnson's attention to an object on one of the shelves; she observed a red fuse protruding from a Shopko bag. Unsure what might be in the bag, Hinkens–Johnson left Mr. Johnson to stand guard over the object and called the police.

When the police arrived, an officer used a razor blade to slice open the Shopko bag in order to observe its contents. That incision revealed that the fuse went into a plastic pipe device. The officer then told Hinkens–Johnson to evacuate the store. Following the evacuation, the police contacted Staff Sergeant Gary Lee Brohard, an explosives ordnance disposal specialist with the United States Army. Staff Sergeant Brohard's primary duties pertain to the recovery, neutralization and disposal of military ordnance, and he is also trained to deal with improvised explosive devices, a category which includes homemade bombs. Learning that there was a "possible pipe bomb" in the department store, Staff Sergeant Brohard agreed to respond to the police request for assistance.

Once on the scene, Brohard and another staff sergeant sent a video camera-equipped robot into the store to pick up the device and to carry it outside to an area that had been partially enclosed with sandbags. Although an attempt to x-ray the device was made, it was unsuccessful because there was a problem with the film. Because the military experts deemed it inadvisable to spend additional time attempting to x-ray the device (not knowing whether it contained a timer), it was then rendered safe with a .50 caliber de-armer. The de-armer is a short-barreled cannon that fires a cartridge into the device. This de-arming process largely destroyed the device.[1]

Prior to de-arming the device, Staff Sergeant Brohard had noted that the message "Where's the other one?" was written on it. This message prompted a search of the Shopko store. That search produced an additional similar device. This second device

---

1. Police Chief Gale Haas inspected the remnants of the device and identified plastic pipe particles, grayish black powder and small nails. He also saw a candle among the remnants.

also was removed by the robot, and the effort to x-ray this second device was successful. The x-ray revealed that the fuse reached into the interior of the device and that the device contained nails and a darker mass which Brohard believed was perhaps an incendiary powder pellet material. In de-arming this second device, Staff Sergeant Brohard aimed at a different portion of the object in order to try to preserve more of the device as evidence. This effort was successful; after the de-armer was fired, one end of the device was knocked off and its contents were strewn about the sandbagged area. The police collected samples of the nails and the black and silver powder contained in the device and also noted that the intact end of the device was sealed with a wax candle.

Special Agent Bradford Hays of the Bureau of Alcohol, Tobacco and Firearms ("ATF") and Police Chief Haas interviewed Mr. Johnson two days later at his home, where he lived with an aunt. In the course of that interview, Mr. Johnson consented to a search of the house. Agent Hays discovered, in the basement, various components of the devices found at the Shopko, including an assortment of nails, plastic tubing, candles and a hacksaw with plastic fragments on the blade. He then confronted Mr. Johnson about constructing the devices. Although Mr. Johnson initially denied any wrongdoing, he ultimately admitted constructing the devices and explained that the plastic pipe he had used for the devices came from Shopko. He had cut the pipe with the hacksaw to make the two different devices and had sealed them by jamming candles into each end. Mr. Johnson also admitted putting nails into the devices. He further explained that he had cut open fireworks and had emptied the contents into the devices. Moreover, Mr. Johnson acknowledged that he had put fuses in each device. The officers escorted Mr. Johnson back to the police station and obtained a written statement from him consistent with his admission.

Mr. Johnson was indicted for possession and construction of the destructive devices. Count I of the indictment charged Mr. Johnson with "knowingly and unlawfully possess[ing] two firearms, as defined in Title 26, United States Code, Section 5845(a) and (f), specifically, destructive devices consisting of plastic pipe, wax end caps, flash (firecracker) powder and cannon/hobby fuse, and containing an assortment of nails, which firearms were not registered to the defendant in the National Firearms Registration and Transfer Record." Count II of the indictment charged Mr. Johnson with knowingly and unlawfully manufacturing those two destructive devices. He pleaded not guilty to the charges, and the matter went to trial.

## B. Proceedings in the District Court

Prior to trial, the government moved in limine to exclude evidence regarding Mr. Johnson's subjective intent in constructing the devices. Mr. Johnson asserted that he did not design the devices for use as weapons and was prepared to offer expert testimony to the effect that the devices he planted in the store were "hoaxes." His alleged motivation for planting these devices was to obtain attention and to enable him to play the hero in discovering the bomb-like devices and in pointing them out to his supervisors. The district court granted the government's motion and excluded this evidence regarding Mr. Johnson's subjective intent on the ground that the devices at issue had objective characteristics that brought them within the statutory definition of "destructive device." *See* 26 U.S.C. § 5845(f). Consequently, the court determined that evidence regarding Mr. Johnson's subjective intent was not relevant.

Because the court thus limited the evidence at trial regarding the devices primarily to their objective characteristics, the expert testimony provided by the parties focused on the design and workability of the devices. Mr. Johnson's experts indicated that the devices as constructed were unlikely, for a variety of reasons, to produce an explosion and therefore were not designed as weapons. The testimony expressed doubt whether the fuses actually reached the incendiary firework powder and consequent doubt that the devices could have been ignited. Moreover, Mr. Johnson's experts testified that it was unlikely the firework powder in the devices would have burned rapidly enough to cause

any explosion or that the powder was of a kind that would produce an explosive, rather than incendiary, effect. The evidence proffered by Mr. Johnson also indicated that, even if the powder were ignited, the candle ends were inadequate to the task of sealing the device. Consequently, according to Mr. Johnson's experts, sufficient pressure was unlikely to build up in the devices to cause an explosion; instead, the candles first would have been forced out of the ends and the powder simply would have burned away.

In contrast, the government's experts indicated that the powder samples obtained from the devices included potassium nitrate, sulfur and aluminum and that such a compound will deflagrate and burn violently in the open and could produce an explosion given proper containment. In addition, the government provided testimony that the devices were designed to function by explosion and to project shrapnel and therefore that they were similar to a bomb.

At the close of the evidence, the jury was instructed regarding the elements of the offenses that the government had to prove beyond a reasonable doubt in order to prevail in its case. The instructions also included a definition of "destructive device" which provided:

> When the term "destructive device" is used in these instructions, it means any explosive bomb or any combination of parts either designed or intended for use in converting any device into a destructive device and from which a destructive device may be readily assembled. It does not include any device that is neither designed nor redesigned for use as a weapon or any device designed originally for use as a weapon that is redesigned for use as a signaling, pyrotechnic, line throwing, safety or similar device.

R.129. Mr. Johnson objected to this definition of destructive device both before trial and in posttrial motions on the ground that the "combination of parts" portion of it impermissibly broadened the scope of the indictment by allowing a basis for conviction that was not presented in the indictment. The district court rejected this argument on the ground that the indictment did not specify the definition of destructive device under § 5845(f) that was being used and that the indictment therefore was general enough to encompass the definition provided in the instructions.

## II

### DISCUSSION

On appeal, Mr. Johnson raises four issues. He contends (1) that the district court abused its discretion in excluding the evidence regarding Mr. Johnson's subjective intent in constructing the devices, (2) that the component parts instruction impermissibly broadened the scope of indictment, (3) that the government provided insufficient evidence of the existence of "flash powder" which Mr. Johnson maintains was an explicit element of the offense, and (4) that, if there was sufficient evidence of "flash powder," it was provided through the ineffective assistance of Mr. Johnson's trial counsel. Mr. Johnson asserts that any or all of these errors require reversal of his conviction for possession of destructive devices. We shall address each of these contentions in turn.

### A.

Mr. Johnson submits that the district court erred when it refused to admit evidence that he did not intend the devices that he made to function as weapons. By precluding this evidence, he argues, the district court denied him the opportunity to demonstrate that the devices were not destructive devices within the meaning of the statute. In his view, when component parts are at issue, the defendant's subjective intent is relevant because the defendant may or may not have possessed these parts with the intent to assemble a weapon. Only when the design of the assembled device is objectively clear, he contends, (for example, when the device is a premanufactured grenade) is the intent of the defendant not relevant. In such a case, the device's design for use as a weapon can be determined unambiguously by examining the object. In this case, the district court ruled that the defense could present no evidence regarding the defendant's intent in designing the device. In Mr. Johnson's view,

this approach prevented his arguing to the jury that he had prepared these items not as weapons but as hoaxes for the purpose of gaining attention.

The government takes the position that the district court committed no error. In its view, the devices at issue here were fully assembled and therefore the subjective intent of the defendant is not relevant. The government stresses that the presence of shrapnel among the explosive material dissolves any possibility that these items can be characterized as something other than destructive devices. Rather, urges the government, we must focus on the physical structure and method of operation of the device to determine that it was designed for use as a weapon.

### 1.

In such a circumstance, we must begin, of course, with the text of the statute. Mr. Johnson was charged and convicted of violating 26 U.S.C. § 5861(d), which makes it unlawful to "receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record." The definition of a "firearm" is set forth in 26 U.S.C. § 5845(a). That definition includes such weapons as shotguns, rifles, machineguns and "destructive device[s]." Our focus must be on the latter term. Subsection (f) provides the definition of a "destructive device." That subsection provides:

> (f) Destructive device.—The term "destructive device" means (1) any explosive, incendiary, or poison gas (A) bomb, (B) grenade, (C) rocket having a propellant charge of more than four ounces, (D) missile having an explosive or incendiary charge of more than one-quarter ounce, (E) mine, or (F) similar device; (2) any type of weapon by whatever name known which will, or which may be readily converted to, expel a projectile by the action of an explosive or other propellant, the barrel or barrels of which have a bore of more than one-half inch in diameter, except a shotgun or shotgun shell which the Secretary finds is generally recognized as particularly suitable for sporting purposes; and (3) any combination of parts either designed or intended for use in converting any device into a destructive device as defined in subparagraphs (1) and (2) and from which a destructive device may be readily assembled. The term "destructive device" shall not include any device which is neither designed nor redesigned for use as a weapon; any device, although originally designed for use as a weapon, which is redesigned for use as a signaling, pyrotechnic, line throwing, safety, or similar device; surplus ordnance sold, loaned, or given by the Secretary of the Army pursuant to the provisions of section 4684(2), 4685, or 4686 of title 10 of the United States Code; or any other device which the Secretary finds is not likely to be used as a weapon, or is an antique or is a rifle which the owner intends to use solely for sporting purposes.

26 U.S.C. § 5845(f).

Therefore, under this subsection, a destructive device may be a fully assembled device, such as a bomb or similar device. See § 5845(f)(1). It may also be either a "combination of parts" designed to convert a device into one of the devices described in the first part of the statute, see § 5845(f)(3), or the component parts intended for use in construction of a destructive device. See id. Notably, intent is not mentioned in § 5845(f)(1); however, intent is mentioned explicitly in the second prong of § 5845(f)(3). It is also notable that the subsection contains an affirmative defense: The term destructive device does not include any device that is not designed for use as a weapon.

In their attempt to give effect to the will of the Congress in the crucible of case-by-case application, the courts have found it necessary to determine the purpose of each subpart of this subsection and to articulate the relationship of each subpart to the others. We are confronted with that same task today. In undertaking such an analysis, we must keep in mind the purpose of the entire subsection and, indeed, of the entire legislation of which it is a part. Whether in dealing with the macrocosm of the entire statute or with the microcosm of the particular subsection before us, we must view the text as a

whole and give effect to all of the statutory language.

At the outset, we note that the overall purpose of the statutory scheme of which this subsection is a part is clear. The legislative history provides some background understanding and makes clear that it is part, a crucial part, of Congress' continuing effort to reduce the number of homicides and other violent crime that has plagued the Nation.[2] Although the legislative history demonstrates a particular concern with commercial weapons, from the beginning, the courts have understood the Congressional concern to extend to homemade devices. This court had occasion to deal with a situation involving such a homemade device in *United States v. Copus*, 93 F.3d 269 (7th Cir.1996). There, we paused to demonstrate that our case law has held consistently that the statute is also applicable to homemade devices. *See id.* at 273 (collecting cases).

■ In applying subsection (f) of the statute, the primary judicial task has been to determine whether a particular device comes within the ambit of the statute and, if so, to determine the applicable subpart. From the early cases forward, the courts have been concerned with distinguishing, in a principled fashion, between items that were, by their very nature, devices that could be used only for illegal purposes and material that could have both a proscribed and a legitimate use. As we shall demonstrate in the pages that follow, the courts soon discerned in the statutory framework a practical analytical pattern: When the device is inherently susceptible only to a use that makes it a destructive device, no further inquiry is necessary; the subsection proscribes its possession. When the defendant possesses parts susceptible to

both a destructive and constructive use, however, further inquiry is necessary in order to ensure that the individual who uses such material to achieve a good social or commercial purpose is not subject to criminal liability.

In *United States v. Posnjak*, 457 F.2d 1110 (2d Cir.1972), the Court of Appeals for the Second Circuit became one of the first courts to deal with the scope of this subsection. The defendant in that case was in possession of commercial dynamite and the court analyzed the defendant's liability under subpart (3) for possession of component parts of a destructive device. It took the view that, when a device's objective character brought it clearly within or without the ambit of subparts (1) or (2) of § 5845(f), additional evidence of intent was irrelevant to establish criminal liability. *See id.* at 1119. The court held that no combination of the commercial dynamite at issue "produces a device as defined in [subparts (1) or (2)]," *id.* at 1120, and therefore intent was irrelevant and no liability attached under subpart (3).

However, the Second Circuit did recognize in *Posnjak* that when a defendant is charged with possession of the component parts that are susceptible to both violent abuse and beneficent use, the analysis is necessarily more nuanced and may require consideration of intent.[3] This complexity is necessary in order to achieve the statute's objective of protecting the public from destructive devices while permitting the use of materials that have a salutary purpose. At times, the possession of certain items, albeit in their unassembled state, nevertheless will make it clear that the items can only be used for a destructive purpose. On the other hand, possession of other items will necessarily leave

---

**2.** In 1968, Congress enacted the Omnibus Crime Control and Safe Streets Act, Pub.L. No. 90–351, 82 Stat. 197, which provided for stricter regulations for the transfer and sale of firearms. Later in 1968, the Gun Control Act was passed, Pub.L. No. 90–618, 82 Stat. 1213. This act further amended provisions regarding the transfer of firearms, *see* 18 U.S.C. §§ 921–928 and also amended the National Firearms Act, 26 U.S.C. §§ 5801–5872 which deals with the registration and taxation of certain weapons. Destructive devices were first included in the definition of "firearm" in the Crime Control Act; that defini-

tion was modified in the Gun Control Act. *See generally United States v. Posnjak*, 457 F.2d 1110, 1113–15 (2d Cir.1972) (reviewing enactments and examining legislative history regarding the definition of destructive device).

**3.** "When ... the components are capable of conversion into both such a [destructive] device and another object not covered by the statute, intention to convert the components into the 'destructive device' may be important." 457 F.2d at 1119.

their purpose ambiguous. In the latter circumstance, the intent of the possessor will be very important; criminal liability only attaches when the possessor intended to possess a device for destructive purposes.

■ The language of subpart (3) reflects the need of the legislative scheme to cover both of these circumstances. The terms "designed" and "intended" as used in § 5845(f)(3) are separated by the disjunctive word "or." This construction suggests that the statutory terms separated by a disjunctive are to be given separate meanings unless the context dictates otherwise. Therefore, under subpart (3), a "device" may be converted into a "destructive device" either because of "design" or because of "intent." *See United States v. Lussier*, 128 F.3d 1312, 1315 & n. 4 (9th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1824, 140 L.Ed.2d 960 (1998); *United States v. Oba*, 448 F.2d 892, 894 (9th Cir.1971), *cert. denied,* 405 U.S. 935, 92 S.Ct. 979, 30 L.Ed.2d 811 (1972). As our colleagues in the Third Circuit recently stated in *United States v. Urban*, 140 F.3d 229 (3d Cir.1998), *petition for cert. filed,* —— U.S.L.W. ——, (U.S. June 8, 1998) (No. 97–9411):

> Thus, looking solely at the plain meaning of the words used by Congress, a person may be found guilty of a violation of § 5861(d) if he or she is in possession of a combination of parts designed for use in converting any device into a destructive device, or if he or she is in possession of a combination of parts intended for use in converting any device into a destructive device.

*Id.* at 232; *see also Lussier*, 128 F.3d at 1315.[4]

Most often, when dealing with combination-of-parts situations, the courts have had to address circumstances in which the particular collection of component parts leaves a measure of ambiguity as to whether they have a benign as well as a destructive use. Consequently, the cases from several circuits, including this circuit, have acknowledged that, when the components are susceptible to both innocent and destructive use, it is necessary to determine the subjective intent of the defendant in gathering them. For instance, writing for this court in *United States v. Tankersley*, 492 F.2d 962, 966 (7th Cir.1974), Judge Kiley was confronted with a situation in which the defendant and his confederates were in possession of a bottle, a firecracker and tape, and paint remover. The Judge noted that, although all of these components "have social utility, in combination they form a destructive device within the ambit of subsection (3)." *Id.* They were the makings of a Molotov cocktail. Under these circumstances, held the court, the intent of the defendant is relevant under subpart (3) to establish liability under the statute. The Fourth Circuit was confronted with a similar situation in *United States v. Morningstar*, 456 F.2d 278 (4th Cir.), *cert. denied,* 409 U.S. 896, 93 S.Ct. 135, 34 L.Ed.2d 153 (1972). In that case, the defendant possessed four sticks of black powder pellet explosive fastened together with electrical tape, together with unattached blasting caps. *See id.* at 279–80. Judge Butzner, writing for the court, held that whether commercial explosives fall within the ambit of the statute must be determined "by the use for which they are intend-

---

4. In the course of its discussion on the question of subjective intent in the destructive device inquiry, this court in *Copus* said that "[i]t is undisputed that, in this circuit, the defendant's subjective intent is relevant to determining whether a 'combination of parts' qualifies as a 'destructive device' under § 5845(f)(3)." 93 F.3d at 272. We do not think that it is a fair reading of this passage to conclude, contrary to the case law that we have cited in the text, that subjective intent is always relevant under subsection (f)(3). In *Copus*, the court simply did not have before it the issue presented in cases such as *Urban*, 140 F.3d at 234, as to component parts which are objectively designed solely for use as a destructive device. The court in *Copus* was concerned

in making the distinction between components parts under subpart (3) and completed devices under subpart (1). Indeed, its summary of the holding in *United States v. Worstine*, 808 F.Supp. 663 (N.D.Ind.1992), makes clear that the fundamental distinction that we have perceived in the cases was not inconsistent with its own analysis. "Rather, the court in *Worstine* merely determined that, where the objective purpose of a device is not clear, the trier of fact *may* look to the defendant's subjective intent, as one element of the totality of the circumstances, to decide whether the device qualifies as a 'destructive device.'" 93 F.3d at 273 (citing *Worstine*, 808 F.Supp. at 669) (emphasis in original).

ed." *Id.* at 280. Notably, in reaching this conclusion, he contrasted subparts (1) and (3). Subpart (1), he wrote, was intended to cover "explosive and incendiary devices which have no business or industrial utility." *Id.* By contrast, he wrote, subpart (3) deals with two types of material from which a destructive device may be assembled:

> The first type is a "combination of parts ... *designed* ... for use in converting any device into a destructive device...." [Emphasis added] such as a bomb. This type includes, for example, the unassembled parts of a military fragmentation or incendiary bomb. Because of their design they are proscribed regardless of how the possessor intends to use them. If Congress had resolved not to include commercial explosives, it could have stopped at this point. Instead, in subparagraph (3) it defined a second type of illegal materials as a "combination of parts ... *intended* for use in converting any device into a destructive device...." [Emphasis added] such as a bomb. It is apparent, therefore, that Congress provided that the use for which these materials are intended determines whether they fall within the Act. This portion of the definition shows that Congress included more than gangster-type weapons and military ordnance. The

plain language of the Act, consequently, establishes that other types of explosives, such as commercial black powder or dynamite, are subject to the Omnibus Crime Control and Safe Streets Act and the National Firearms Act depending on their intended use. This interpretation of the Act accords with *Langel v. United States*, 451 F.2d 957, 962 (8th Cir.1971) (dynamite, fuse, and cap); *United States v. Oba*, 448 F.2d 892, 894 (9th Cir.1971) (dynamite, fuse, and cap); *United States v. Davis*, 313 F.Supp. 710, 713 (D.Conn.1970) (bottles, gasoline, and strips of cloth); and *United States v. Harflinger*, 436 F.2d 928, 929 n. 1 (8th Cir.1970) (by implication-dynamite, fuse, cap, wire, clock, and battery).

*Id.* at 280–81.[5]

■ Both the first clause of subpart (3) and the sentence establishing an affirmative defense employ the term "design." The courts that have focused on this term usually have considered the question of "design" to be an objective one.[6] However, they have also considered it a question of fact for the jury as to whether the design was, objectively speaking, a destructive device within the meaning of the statute.[7] The ultimate issue in this inquiry is whether the device can be regarded as having "no legitimate social pur-

---

**5.** Other courts have simply noted that, when the subjective intent of the defendant to use the device in a destructive way is admitted, liability under the statute is established. For instance, in *Oba*, 448 F.2d at 894, the Court of Appeals for the Ninth Circuit noted that, in his guilty plea, the defendant had admitted that he had the intent to blow up the City of Eugene, Oregon. Therefore, even if the seven dynamite sticks wrapped in copper wire and equipped with a fuse and blasting caps possibly could be considered as "ambiguous" in their design, his admission clarified that ambiguity and clearly established his liability under the statute. Although the device appears to have been assembled completely, the court, for reasons not apparent in the opinion, assumed that the situation ought to be analyzed under subpart (3). *See id.*

**6.** In *Posnjak*, for example, the court noted that the original language proposed for the affirmative defense in § 5845(f) provided that items "neither designed nor redesigned nor used nor intended for use as a weapon" are not "destructive devices." 457 F.2d at 1117 (internal quotation omitted); *see also* H.R. Rep. No. 90–1577 (1968), *reprinted in* 1968 U.S.C.C.A.N. 4410, 4418. The court deduced that, because the "in-

tended for use" language was removed in the final version of the statute, "the standard was to be an objective one, not dependent on the 'intent' or schemes of the possessor." 457 F.2d at 1118. This view of "design" as objective is also found in the cases that contrast proof of a destructive device under subpart (3) through either design or intent. *See, e.g., Urban*, 140 F.3d at 232–34; *Lussier*, 128 F.3d at 1315.

**7.** *See Copus*, 93 F.3d at 273 (question of whether detonators were designed as weapons was a jury question); *see also United States v. Thomas*, 111 F.3d 426, 428 (6th Cir.) (noting that the testimony of record established that the device in question was not good for any industrial or social use), *cert. denied,* —— U.S. ——, 118 S.Ct. 209, 139 L.Ed.2d 145 (1997); *cf. United States v. Reindeau*, 947 F.2d 32, 35–36 (2d Cir.1991) (holding that the defendant was denied wrongfully his right to cross-examine on the issue of whether the device was designed as a pipe bomb or as a firecracker and that the jury "may have found reasonable doubt" if that right was not denied).

pose." *United States v. Markley,* 567 F.2d 523, 527 (1st Cir.1977), *cert. denied,* 435 U.S. 951, 98 S.Ct. 1578, 55 L.Ed.2d 801 (1978). Notably, our colleagues in the Fifth Circuit have determined that a device designed to release shrapnel can be determined to be a "destructive device." *See United States v. Charles,* 883 F.2d 355, 357 (5th Cir.1989) (finding that evidence supported jury verdict for possession of destructive devices because the devices at issue, when detonated, "exploded loudly and released shrapnel as a grenade would have done"), *cert. denied,* 493 U.S. 1033, 110 S.Ct. 750, 107 L.Ed.2d 767 (1990).

Therefore, the case law demonstrates a fundamental distinction between devices and components that are, by their very nature, ones that can be used only for illegal purposes and devices and components that could have both a proscribed and a legitimate use. When the destructive nature of the devices or of the component parts is obvious because they are suited only for a proscribed purpose, no inquiry into the intent of the possessor is necessary; when the item or items charged under subpart (3) can serve either a destructive or a salutary purpose, the intent of the possessor becomes important and criminal liability only attaches when the possessor intends to possess a device for destructive purposes.

**2.**

We now turn to the situation before us. At the outset, we note that, when a device is completely assembled, the appropriate course is to proceed under subpart (1). *See Copus,* 93 F.3d at 272. Here, there was some evidence, offered by the defense, that the device was not sufficiently assembled to detonate. Under these circumstances, the district court acted within its discretion by instructing the jury with respect to liability under subpart (3), the "combination of parts" provision. As we have discussed earlier, we also think it is now clear that, when the government is proceeding under subpart (3), the question of the possessor's intent is relevant only when the objective characteristics

of the device demonstrate that it may not be a weapon.

There appears to be no question that the devices in question had all the ingredients necessary to make a destructive device, including shrapnel. Mr. Johnson submits, however, that, because the construction was so faulty, he was entitled to have the jury consider whether his actual intent was to make hoax devices. We cannot accept this view. Rather, we believe that an objective inquiry into whether the particular device is designed as a destructive device must focus on whether the device, or under subsection (3), the component parts, can be considered to have any value other than as a weapon. We do not think the statute contemplates that the imposition of criminal liability ought to turn on the degree of workmanship of the device. There well may be instances when the construction of a device, objectively assessed, raises the reasonable possibility that it was designed as something other than a destructive device. *Cf. United States v. Worstine,* 808 F.Supp. 663, 664, 668–70 (N.D.Ind. 1992) (noting the obvious design differences between a galvanized pipe bomb and PVC tubing "firecracker-type" devices). A firecracker has a useful social and commercial purpose. Here, we deal with items having no such attribute. Rather, they contained all of the properties of a destructive device, including shrapnel.

In sum, we conclude that the "destructive device" definition contained in 26 U.S.C. § 5845(f) was intended to operate in a precise but flexible manner. Generally, persons in possession of fully assembled devices that are clearly bombs or similar devices will be charged only under subpart (1). In those cases, the only issue is whether the objective characteristics of the device bring it within the ambit of the statute; subjective intent regarding the device is not an appropriate consideration in that inquiry. In contrast, a person found to possess unassembled component parts or an assembled combination of parts that is less clearly within the ambit of subpart (1) generally will be charged under subpart (3).[8] In those cases, we have ex-

---

8. As a practical matter, we think it likely that

most homemade bomb cases, like this one, will

plained that the statute indicates that the objective characteristics of the device or component parts first should be considered. If the objective design of the device or component parts indicates that the object may only be used as a weapon, i.e., for no legitimate social or commercial purpose, then the inquiry is at an end and subjective intent is not relevant. However, if the objective design inquiry is not dispositive because the assembled device or unassembled parts may form an object with both a legitimate and an illegitimate use, then subjective intent is an appropriate consideration in determining whether the device or parts at issue constitute a destructive device under subpart (3).

Accordingly, in light of that understanding of the statute, we do not think that the district court committed error in its decision to exclude evidence of the defendant's actual intent in making the devices. The objective characteristics of these devices indicated that they were useful only as weapons. Shoddy workmanship cannot make a device that contains all the ingredients necessary to inflict harm, and to do nothing more, into something more benign.

**B.**

◼ In a related argument, Mr. Johnson contends that the district court impermissibly broadened the indictment when it permitted the case to go to the jury not only on the theory that he had possessed a destructive device, namely an "explosive bomb" (under subpart (1)) but also on the alternate theory that he had possessed "any combination of parts ... from which a destructive device may be readily assembled" (under subpart (3)). He points out that the indictment returned by the grand jury charged him with possessing specific items: "destructive devices consisting of plastic pipe, wax end caps, flash (firecracker) powder and cannon/hobby fuse, and containing an assortment of nails." He was not, in his view, charged with possessing unassembled component parts that

be charged under subpart (3) because that allows the government a more flexible method of proving the case.

could be made into a destructive device. Nevertheless, over his objection, the court instructed the jury that it could convict him on the theory that he possessed the component parts. This instruction permitted the jury, he contends, to convict him on the basis of testimony that, in addition to the devices charged in the indictment, he had stored material at his aunt's home and buried other material on her property.

The government points out that the court's instructions specifically required that the defendant possess the devices that are mentioned in the indictment. The government further points out that, throughout the trial, the government focused exclusively upon the devices discovered in the Shopko store.

As we have already noted in the previous section of this opinion, we believe that the district court acted well within its discretion when it decided to instruct the jury on a theory of liability under subpart (1) as well as under subpart (3). Moreover, we agree with the government that the instructions to the jury required the jury to focus on the specific devices charged in the indictment. We shall not presume that the jurors failed to follow the instructions given by the district court.

**C.**

Mr. Johnson next mounts an attack on the sufficiency of the evidence supporting his conviction for possession of destructive devices. Particularly, Mr. Johnson notes that the indictment charged him with possessing "two firearms ... specifically, destructive devices consisting of," inter alia, "flash (firecracker) powder." It is Mr. Johnson's position that the government was required to prove the existence of flash powder as an essential element of the offense and that the proof at trial did not establish the existence of that element beyond a reasonable doubt. Moreover, according to Mr. Johnson, "flash powder" is a term of art that refers to specific chemical compounds.[9] By including the

9. The record before us, including the expert testimony at trial regarding explosives and fireworks, suggests that "flash powder" is indeed a term of art in this field. For example, one of the government's experts testified on cross examination that

term "flash powder" in the indictment, Mr. Johnson insists that the government obligated itself to prove the existence of the particular compounds in "flash powder" as an essential element of the offense and that it failed to do so. Mr. Johnson wages an uphill battle in his sufficiency challenge because we will overturn a jury verdict for insufficiency of the evidence only if, viewing the evidence in the light most favorable to the prosecution, no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See United States v. Webster*, 125 F.3d 1024, 1034 (7th Cir.1997) (citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)), *cert. denied*, —— U.S. ——, 118 S.Ct. 698, 139 L.Ed.2d 642 (1998).

■ Before considering the evidence regarding flash powder, however, we first must address whether the existence of flash powder is an essential element of the offense charged in the indictment. Mr. Johnson relies principally on two cases to establish that the government was required to prove that the devices possessed the precise characteristics as defined in the indictment. The first of these is *United States v. Leichtnam*, 948 F.2d 370 (7th Cir.1991). In *Leichtnam*, the defendant was charged with illegal use and possession of a firearm, specifically that he "did knowingly use and carry a firearm, to wit: a Mossberg rifle." *Id.* at 374 (internal quotation omitted). However, the prosecution adduced evidence at trial regarding three firearms (two handguns and the Mossberg). The jury instruction regarding the use and possession count of the indictment provided that the jury could convict on the basis that the defendant had used or carried "a firearm." This court determined that the instruction impermissibly broadened the indictment in violation of the Fifth Amendment because the jury could have concluded from the instruction that the defendant properly could be convicted on the basis of using any of the three guns despite the fact that the indictment charged him specifically with use

and possession of the Mossberg. *See id.* at 379. Mr. Johnson asserts that *Leichtnam* indicates that the government in this case had to prove he possessed the precise devices described in the indictment and not some different or substantially similar devices.

In addition to *Leichtnam*, Mr. Johnson also relies on *United States v. Willoughby*, 27 F.3d 263 (7th Cir.1994), for the principle that words of limitation in an indictment such as the words "to wit" narrow the charge and correspondingly make the language that follows an essential element of the offense. In *Willoughby*, the defendant was charged with using a firearm "during and in relation to a drug trafficking crime, to wit: the distribution of cocaine." *Id.* at 266 (internal quotation omitted). The evidence at trial established the different offense of possession with intent to distribute cocaine. Consequently, the court found that the proof at trial did not conform to the offense charged in the indictment. The court stated that " '[t]o wit' is an expression of limitation which ... makes what follows an essential part of the charged offense." *Id.* Accordingly, the court determined that the government had made, through the structure of the indictment, the offense of distribution of cocaine an element of the offense. Mr. Johnson contends that the word "specifically" in the indictment in this case is a word of limitation that made the descriptive terms that followed it, including "flash (firecracker) powder," essential elements of the offense.

Here, the government contends that proof of "flash powder" in its technical chemical sense is not an essential element of the offense. Instead, the government notes our decisions stating that a variance from the indictment will not implicate a defendant's Fifth Amendment rights unless the variance affects an essential or material element of the offense. *See United States v. Quintanilla*, 2 F.3d 1469, 1475 (7th Cir.1993); *United States v. Clark*, 943 F.2d 775, 783 (7th Cir. 1991), *cert. denied*, 509 U.S. 926, 113 S.Ct.

flash powder is a mixture of "aluminum and sulfur and potassium chloride." In addition, federal regulations define "flash powder" as an "explosive material intended to produce an audible report and a flash of light when ignited which includes but is not limited to oxidizers such as potassium chlorate or potassium perchlorate, and fuels such as sulfur or aluminum powder." 27 C.F.R. § 55.11.

3045, 125 L.Ed.2d 730 (1993); *United States v. Auerbach,* 913 F.2d 407, 411 (7th Cir.1990). In that context, we have defined an " 'essential' or 'material' element of a crime [a]s one whose specification with precise accuracy is necessary to establish the very illegality of the behavior and thus the court's jurisdiction." *United States v. Cina,* 699 F.2d 853, 859 (7th Cir.), *cert. denied,* 464 U.S. 991, 104 S.Ct. 481, 78 L.Ed.2d 679 (1983). The government contends that it was required to prove only that the devices had the general characteristics described; that is, it had to prove that the substance the device contained was an explosive mixture, but not that the explosive mixture was that type of chemical composition specifically called "flash powder" by industry experts. Proof of the existence of "flash powder" in that sense, the government maintains, was not required to establish "the very illegality" of Mr. Johnson's behavior.

■ We cannot accept the extremely narrow reading of the indictment that Mr. Johnson would have us adopt. Although we recognize that to some extent the characteristics of the devices as charged had to be established by the government, we do not believe that the government was constrained to prove the specific hyper-technical details of each. Mr. Johnson was charged with unlawful possession of two firearms, "specifically, destructive devices consisting of plastic pipe, wax end caps, flash (firecracker) powder and cannon/hobby fuse, and containing an assortment of nails." We think that the government was required to provide proof substantially consistent with that description. However, we do not think minor differences in the nuances of the description of the devices can support a claim that the government did not prove its case. *Cf. United States v. Jungles,* 903 F.2d 468, 476 (7th Cir.1990) (holding that technical difference of party's status as independent contractor instead of an "employee" as charged in the indictment was a matter of semantics and was not a variance from the indictment).

We think the description of "flash (firecracker) powder" in the indictment required the government to prove that the devices included a component of an explosive or incendiary powder. If the government failed to prove that, then the devices could not be properly termed "destructive." To that extent, therefore, we agree with Mr. Johnson that the element of "flash powder" was essential. However, we do not think it was necessary for the government to prove that "flash powder," as Mr. Johnson's experts defined it, was present. Especially in light of the modification of "flash powder" with the term "firecracker," we do not think that the charge was intended to require proof of the term in its technical, industry sense.

■ With that in mind, we turn to the proof regarding "flash (firecracker) powder" to determine if the government provided sufficient evidence on that element of the offense. The prosecution offered evidence at trial that Mr. Johnson admitted cutting open fireworks and pouring their contents into the devices. Therefore, there was evidence that firecracker powder was placed in the devices. Moreover, the government's experts indicated at trial that the powder samples obtained from the remnants of the devices were incendiary in nature and were capable of producing an explosion. Agent Hays of the ATF referred to the powder that he observed in the devices generically as "flash powder." The chemical composition of the powder identified by the government expert was sulfur, aluminum and potassium nitrate.

Mr. Johnson contends that this is a failure of proof because "flash powder" is actually comprised of sulfur, aluminum and an oxidizer such as potassium chloride (but not potassium nitrate). We cannot accept this position. The evidence offered at trial indicated that Mr. Johnson had provided the explosive component of the devices, "flash (firecracker) powder," by emptying the contents of fireworks into the devices. There was also ample evidence that the powder samples obtained from the devices were of a nature capable of deflagrating and exploding under the right conditions. Therefore, the evidence was sufficient to support the jury's determination that Mr. Johnson possessed destructive devices as charged in the indictment, including the component of "flash (firecracker) powder."

## D.

Mr. Johnson, in a final effort to obtain reversal, argues that if we conclude that there was sufficient evidence of "flash powder" that can only be because his trial counsel elicited that evidence. Therefore, he maintains that if we find that the evidence was sufficient, we must reverse on the ground that he received ineffective assistance of counsel. Mr. Johnson's counsel was not ineffective. The majority of the evidence at trial indicating that "flash (firecracker) powder" was part of the devices was offered by the government. Therefore, there is no merit to Mr. Johnson's argument that his counsel was inadequate to the extent that she provided the only evidence on that element of the offense.

## Conclusion

Mr. Johnson placed devices with the objective characteristics of bombs in a department store, thereby endangering himself and members of the public. For the foregoing reasons, he was properly convicted for possession of those devices under 26 U.S.C. §§ 5861(d) and 5845(f). Consequently, the judgment of the district court is affirmed.

AFFIRMED.