In the

# United States Court of Appeals

## For the Seventh Circuit

No. 01-2703

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JOSEPH H. FLEISCHLI,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 00 CR 30008—**Richard Mills**, *Judge.*

ARGUED JANUARY 7, 2002—DECIDED SEPTEMBER 12, 2002

Before MANION, ROVNER and EVANS, *Circuit Judges.*

ROVNER, *Circuit Judge.* Joseph Fleischli was convicted by a jury of two counts of possession of machine guns in violation of 18 U.S.C. § 922(o)(1), one count of transportation of a firearm by a felon in violation of 18 U.S.C. § 922(g)(1), one count of possession of a firearm by a felon in violation of 18 U.S.C. § 922(g)(1), one count of unlawful manufacture of a machine gun in violation of 26 U.S.C. § 5861(f), and one count of possession of an unregistered destructive device in violation of 26 U.S.C. § 5861(d). Fleischli was sentenced to 120 months' imprisonment, three years of supervised release and a $600 special assessment. He appeals from both his conviction and his

sentence on numerous constitutional, statutory and factual grounds. We affirm.

**I.**

Fleischli concedes that prior to the events that led to his indictment, he had been convicted of four felonies. Two convictions related to the illegal manufacture and possession of firearms and two related to illegal drugs. In March and May of 1998, an informant told the Springfield, Illinois ATF office that Fleischli had an aircraft machine gun (sometimes called a "minigun") and that Fleischli had taken it to Missouri in the Spring of 1998. The informant said that in Missouri, Fleischli and others had fired the minigun. Around this same time, Donald Gibbs, an associate of Fleischli, approached Deputy James Malone in the Macoupin County Sheriff's Department with an unusual request. Gibbs wanted the Sheriff's Department to issue a letter to the Treasury Department requesting a demonstration of a Steyr machine gun in anticipation of a possible purchase. Gibbs gave the deputy Fleischli's business card which listed Fleischli as president of Springfield Armaments Services, Inc. ("SAS"), a Class II licensed firearms manufacturer. Gibbs told the deputy that Fleischli was a licensed firearms manufacturer who owned a minigun and wanted to add to his collection. Gibbs provided the deputy with a sample letter to use in drafting the letter to the Treasury Department, requesting permission for Fleischli, as a licensed dealer, to purchase the gun. The deputy recognized Gibbs as a convicted felon and notified his captain who, in turn, notified the Springfield ATF about this strange encounter.

The ATF learned that SAS was incorporated in 1996 by Delmar and Diamonda Tobias, who were Fleischli's father-in-law and mother-in-law, and by Vernon Medlock. These three made up the board of directors as well. Delmar

Tobias[1] was listed as president and Medlock was the secretary/treasurer. Apparently, Fleischli had attempted (and failed) to obtain a federal firearms license in 1991 and sought restoration of his federal explosives privileges in 1993. The ATF was therefore already familiar with Fleischli when Captain Jeff Rhodes called from the Sheriff's Department to tell them about Gibbs' conversation with Deputy Malone. The ATF agents decided to investigate, with the aid of Deputy Malone, possible firearms violations by Fleischli.

The ATF subsequently recorded a number of calls between Malone and Fleischli. The deputy initiated contact by calling the number listed on the business card provided by Gibbs. That number turned out to belong to Otto American Boiler, a business Fleischli owned in Springfield. During these recorded calls, Fleischli told the deputy about his firearms manufacturing business, the minigun he had constructed, and other machine guns he owned. To persuade the Sheriff's Department to issue the Treasury letter, Fleischli agreed to demonstrate the minigun on August 11, 1998 at the Brittany Range in Macoupin County. At the August 11 demonstration, ATF seized the minigun. ATF agents questioned Fleischli, Delmar Tobias and Medlock about SAS. Fleischli said the minigun belonged to SAS, that SAS was Tobias's company and that he (Fleischli) was just an employee. Fleischli admitted he possessed other machine guns in a safe at Otto American Boiler and other firearms at his home. Fleischli volunteered that an ATF agent previously told him he could not obtain a federal firearms license in his wife's name so he decided to use his father-in-law instead. As the finger-pointing escalated, Tobias told the agents that SAS was Fleischli's idea and that Tobias was simply a

---

[1] Hereafter we will use the name "Tobias" to refer to Delmar Tobias.

partner. Tobias told the agents that Fleischli purchased all the guns that were registered to SAS. Medlock also washed his hands of blame, telling the agents that Fleischli asked him to be secretary/treasurer of SAS but that he received no pay and played no active role in the company.

On that same day, ATF agents armed with warrants obtained before this questioning searched Otto American Boiler, SAS and Fleischli's home. The agents recovered approximately seventy-five firearms from Fleischli's home. They seized machine guns, machine gun parts and explosive devices from his place of business. Machine guns registered to SAS were found at Otto American Boiler. Registration forms and other paperwork related to the guns were found at Otto American Boiler in Fleischli's office in his desk drawer. Following these seizures on August 11, the agents gathered evidence about the prior shooting demonstration in Missouri. They obtained witness statements, a videotape of the event, and photographs. A six-count indictment against Fleischli followed.

Fleischli moved to suppress evidence seized from his home and business and moved to dismiss the indictment. He argued that the search warrants were not based on probable cause because one of the informants supplying information used to obtain the warrant was not reliable. That informant, Danny Dapron, told the agents he had last seen the minigun and other guns at Fleischli's home and business on February 1, 1998. Dapron had a checkered past himself and Fleischli argued he could not have seen the guns on February 1, 1998 because he (Dapron) was in jail at that time. The court denied the motion to suppress because Dapron was just one of several sources of information supporting the warrant. Indeed, Fleischli himself had independently corroborated Dapron's statements during his many recorded conversations with Deputy Malone. The district court therefore denied the motion to suppress and also rejected Fleischli's

arguments in support of his motion to dismiss the indictment. A jury subsequently found Fleischli guilty on all six counts and the district court sentenced him to 120 months' imprisonment. In determining Fleischli's sentence, the court included a two-level increase for his role in the offense as manager of an illegal business. Fleischli appeals.

## II.

Fleischli raises eleven challenges to his conviction and one to his sentence for an even dozen. He contends that: (1) there was no probable cause to issue the warrants used to search his home and business premises on August 11, 1998; (2) he was exempt from section 922(o)(1) by virtue of section 922(o)(2) because he was an authorized agent of a licensed firearms manufacturer; (3) section 922(o)(1) exceeds Congress's powers under the Commerce Clause; (4) the government failed to prove in the section 922(g)(1) possession count that Fleischli's possession of firearms substantially affected interstate commerce; (5) section 922(g)(1) exceeds Congress's powers under the Commerce Clause to the extent that it applies to Fleischli's mere possession of firearms in his home and business; (6) section 5822 does not encompass Fleischli's manufacture of machine guns because he was acting as an agent of a licensed manufacturer; (7) the minigun was not a machine gun within the meaning of section 5845 because it does not fire automatically and does not have a trigger; (8) the term "similar device" in the definition of the term "destructive device" in section 5845 is unconstitutionally vague; (9) the four alleged destructive devices seized from Fleischli did not come within the purview of section 5845(f) because they were used only as fireworks; (10) Fleischli could not be convicted of transporting firearms under section 922(g)(1) because he was merely a passenger in a

vehicle used to transport firearms; (11) evidence of Fleischli's possession of firearms in Missouri was inadmissable under the Sixth Amendment which requires that a person be tried within the state and district in which the crime occurred; and (12) the court erred in applying a two-level enhancement for Fleischli's role in the offense because there were no other participants in the offense. A number of Fleischli's arguments are easily resolved by well-settled law and we will address them in summary fashion.

### A.

On August 11, 1998, ATF agents searched Fleischli's home and business pursuant to two warrants. The warrants were issued on the basis of probable cause established by the affidavit of ATF Special Agent Robert Schmidt. Fleischli maintains that the warrants were improperly issued and not based on probable cause because Agent Schmidt credited information from Danny Lee Dapron, an unreliable informant, in drafting his affidavit. In the affidavit, Schmidt reported that he interviewed Dapron, a former employee of Otto American Boiler. Dapron told Schmidt that he saw the minigun at Otto American Boiler on February 1, 1998, and that Fleischli kept another gun in a safe on the premises as well. Dapron also reported seeing a number of firearms in a vault in the basement of Fleischli's home on that same day. Fleischli complains that the affidavit did not contain the basis of Dapron's knowledge and that the agent did not corroborate the information. Moreover, Fleischli contends, Dapron was an unreliable source with a criminal record who was actually in jail on February 1, 1998, the day he claims to have seen guns at Fleischli's home and business. Finally, Fleischli complains that the information provided by Dapron was stale by the time the warrant

was executed, approximately six months later. Fleischli thus asks us to conclude that the warrant was not based on probable cause and that the evidence seized from his home and business should be suppressed.

We review *de novo* the district court's determination that probable cause existed to support a search warrant. *Ornelas v. United States*, 517 U.S. 690, 699 (1996); *United States v. Singleton*, 125 F.3d 1097, 1102 (7th Cir. 1997), *cert. denied*, 522 U.S. 1098 (1998). We review for clear error, however, findings of historical fact and give due weight to inferences drawn from those facts by resident judges and local law enforcement agencies. *Ornelas*, 517 U.S. at 699; *Singleton*, 125 F.3d at 1102. We begin by reviewing the affidavit on which the court relied in issuing the warrants. Special Agent Schmidt's twelve-page affidavit contains an extensive amount of information from a variety of sources, including Fleischli himself. In recorded conversations with Deputy Malone, Fleischli corroborated much of the information provided by Dapron and others. A few examples will suffice to demonstrate the reliability of the information provided in the affidavit.

Dapron, a family friend of Fleischli's for thirty-seven years, worked at Otto American Boiler for a number of years. He correctly identified Delmar and Diamonda Tobias as Fleischli's in-laws, he knew that Fleischli's wife held an Illinois explosives license, he knew that Fleischli had taken the guns to Knob Creek, Kentucky for shooting demonstrations on a number of occasions, and he knew where Fleischli stored his guns in safes both at his home and at Otto American Boiler. Dapron identified the types of guns Fleischli owned, naming the models and manufacturers. In short, Dapron demonstrated an intimate knowledge of Fleischli, his guns, and his home and business. Much of the detailed information provided by Dapron was corroborated by Fleischli himself, lending further credibility to Dapron's information. Fleischli told

Malone, for example, that he had just returned from a machine gun shoot in Knob Creek, Kentucky, and that he had attended shooting events at Knob Creek twice a year for eighteen years. Fleischli told the deputy he had brought several guns with him down to Knob Creek. When asking for the Treasury letter, Fleischli originally asked that it be sent to 1905 East Washington, which turned out to be the address of Otto American Boiler. The phone number on Fleischli's business card for SAS also turned out to be the number of Otto American Boiler. Fleischli also told the deputy about some of the guns he owned, including some that had been identified by Dapron. Special Agent Schmidt confirmed that Fleischli's wife held a valid explosives license from the State of Illinois. Further confirmation of Dapron's information was provided by Delmar Tobias who told a sheriff's deputy that his son-in-law stored the minigun in his (Fleischli's) safe. When an affidavit relies on an informant's tip, the issuing judge must look to the totality of the circumstances in determining whether probable cause exists. *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *United States v. Spry*, 190 F.3d 829, 835 (7th Cir. 1999), *cert. denied*, 529 U.S. 1130 (2000). Probable cause is a fluid concept, based on a reasonable belief that evidence in the place to be searched will lead to an arrest or conviction for a particular offense. *United States v. McClinton*, 135 F.3d 1178, 1183 (7th Cir. 1998), *cert. denied*, 524 U.S. 921 and 525 U.S. 885 (1998). "Probable cause denotes more than a mere suspicion, but does not require certainty." *Id*. Special Agent Schmidt's affidavit provides sufficiently reliable information on which to base a finding of probable cause. In addition to information from Dapron and Fleischli himself, Special Agent Schmidt relied on information from another confidential informant, from Fleischli's associate Gibbs, and from sheriff's department and ATF investigators. Although Dapron was the only link to the location where the guns would be found, numerous sources including Fleischli

himself verified that he currently possessed a large number of firearms. Although Dapron had a criminal record and may have misidentified the date on which he last saw the guns, he demonstrated an extensive and intimate knowledge of Fleischli's family, business and home, as well as his gun collection. Much of this information was independently corroborated, lending further credibility to the facts that could not be confirmed until the search was actually conducted (i.e., the presence of guns in particular locations within Fleischli's home and business). The court thus did not err in issuing the warrant based on information provided by Dapron and others.

## B.

Fleischli was convicted of two counts of possession of machine guns in violation of 18 U.S.C. § 922(o)(1). He argues on appeal that he was exempt from the operation of section 922(o)(1) by virtue of section 922(o)(2) and the accompanying federal regulations. Section 922(o)(1) states:

> Except as provided in paragraph (2), it shall be unlawful for any person to transfer or possess a machinegun.

19 U.S.C. § 922(o)(1). Section 922(o)(2) states in relevant part:

> This subsection does not apply with respect to . . . a transfer to or by, or possession by or under the authority of, the United States or any department or agency thereof or a State, or a department, agency, or political subdivision thereof[.]

18 U.S.C. § 922(o)(2)(A). Federal regulations provide that qualified manufacturers may "import and manufacture machine guns . . . for use by dealers qualified under this part as samples as provided in paragraph (d) of this section." 27 C.F.R. § 179.105(c). Paragraph (d), in turn, explains that applications to transfer and register certain

machine guns will be approved "if it is established by specific information the expected governmental customers who would require a demonstration of the weapon . . . and letters from governmental entities expressing a need for a particular model or interest in seeing a demonstration of a particular weapon." Presumably this is the letter Fleischli and Gibbs sought to have the Sheriff's Department issue. Fleischli now argues that, in the Spring of 1998, when he transported machine guns to Missouri, he was authorized to do so by the president of SAS, a licensed manufacturer, and he was accompanied by the president of SAS on this trip as well. Because he was acting as an agent of the corporation, his possession of the guns was the corporations's possession. He thus maintains that he did not violate section 922(o)(1).

We review this question of statutory interpretation *de novo*. *United States v. Jain*, 174 F.3d 892, 897 (7th Cir. 1999), *cert. denied*, 528 U.S. 889 (1999). Fleischli, in essence, argues that a felon who may not possess any firearms may immunize himself from prosecution for possessing more tightly regulated machine guns by hiding behind a corporate charter. He maintains that because his status as a felon is not an element of a section 922(o) violation, he may not be prosecuted under that provision if a licensed corporation authorized him to possess and transport a machine gun. Fleischli's argument is bold but unavailing. First, SAS would never have obtained a license if it had truthfully disclosed that it was a front for a convicted felon to gain access to firearms. Under 18 U.S.C. § 923(d)(1), an applicant for a license to manufacture or deal in firearms will be approved if "the applicant (including, in the case of a corporation, partnership, or association, any individual possessing, directly or indirectly, the power to direct or cause the direction of the management and policies of the corporation, partnership, or association) is not prohibited from transporting, shipping, or receiving

firearms or ammunition in interstate commerce under section 922(g) and (n) of this chapter[.]" In other words, if Fleischli had held himself out to be the president of SAS during the licensing process (as he did when he approached the Sheriff's Department for the Treasury letter), SAS would not have received its license. *See also* 18 U.S.C. § 925(b) (allowing a licensed manufacturer, dealer or collector under indictment for a felony to continue operations until any conviction pursuant to the indictment becomes final). The statutory scheme when viewed as a whole was never intended to allow convicted felons to hide behind a corporate charter to gain access to the most heavily regulated firearms, such as machine guns.

Second, it is well-settled that "an agent cannot be insulated from criminal liability by the fact that his principal authorized his conduct." *McNamara v. Johnston*, 522 F.2d 1157, 1165 (7th Cir. 1975), *cert. denied*, 425 U.S. 911 (1976). *See also Gillespie v. City of Indianapolis*, 185 F.3d 693 (7th Cir. 1999), *cert. denied*, 528 U.S. 1116 (2000) (upholding challenge to section 922(g)(9) by a police officer who lost his job because he could not possess a firearm after being convicted of domestic violence); *United States v. Floyd*, 882 F.2d 235, 240 (7th Cir. 1989) (holding union official could not be absolved of wrongdoing by claiming the act was done with union authorization under the principal recognized in *McNamara*). In short, a convicted felon who could not have legitimately obtained a manufacturer's or dealer's license may not obtain access to machine guns by setting up a sham corporation.

## C.

Fleischli next contends that Congress exceeded its powers under the Commerce Clause when it enacted section 922(o)(1). Fleischli concedes that we have previously rejected a Commerce Clause challenge to section 922(o).

*See United States v. Kenney*, 91 F.3d 884 (7th Cir. 1996). He maintains, however, that *Kenney* is now in conflict with the Supreme Court's more recent ruling in *United States v. Morrison*, 529 U.S. 598 (2000), and that we must therefore reverse his convictions on Counts 1 and 3. In *Morrison*, the Supreme Court struck down a section of the Violence Against Women Act that created a federal civil remedy for gender-motivated violence because gender-motivated violence is not an activity that substantially affects interstate commerce. Nothing in *Morrison* casts doubt on the validity of section 922(o)(1), and our analysis in *Kenney* remains sound. *See also United States v. Haney*, 264 F.3d 1161, 1166-71 (10th Cir. 2001), *cert. denied*, 122 S. Ct. 2362 (2002) (upholding section 922(o) against a post-*Morrison* Commerce Clause challenge). Seeing no reason to doubt our earlier analysis and no reason to split from the well-reasoned decision of our sister circuit, we affirm Fleischli's convictions on Counts 1 and 3.

## D.

Fleischli challenges his conviction under 18 U.S.C. § 922(g)(1), the "felon in possession" statute, because the government was not required to prove that his possession of firearms substantially affected interstate commerce. Again Fleischli acknowledges that we have rejected an identical argument in the past. *See Gillespie*, 185 F.3d at 705. This time he maintains that *Gillespie* cannot stand in light of *Jones v. United States*, 529 U.S. 848 (2000). But we have rejected that argument as well, and Fleischli offers us no reason to reconsider our earlier opinions. *See United States v. Mitchell*, 2002 WL 1790467, *2 (7th Cir. Aug. 5, 2002); *United States v. Wesela*, 223 F.3d 656, 660 (7th Cir. 2000), *cert. denied*, 531 U.S. 1174 (2001). *See also United States v. Singletary*, 268 F.3d 196, 205 (3rd Cir. 2001), *cert. denied*, 122 S. Ct. 1450 (2002) (collecting cases).

**E.**

We next review Fleischli's claim that section 922(g)(1) does not extend to firearms possessed in Fleischli's home or business. He bases this argument on *Jones*, stating that the possession of firearms in a home or non-firearms related business (presumably Otto American Boiler) is not in any sense commercial activity. Thus, he argues, as applied to him, section 922(g)(1) exceeds Congress's powers under the Commerce Clause. This is a curious argument given Fleischli's claim above that he did not personally possess any of the firearms but rather held them as an agent of SAS, a licensed firearms manufacturer. In that capacity, we have no doubt he would concede his possession of firearms affected commerce. Fleischli is entitled to argue in the alternative, however. This claim is really just a slightly different twist on Fleischli's claim above that the government should have been required to prove that his possession of firearms substantially affected interstate commerce. We have held numerous times that the Commerce Clause requirement is met in the case of firearms possession when the guns have previously traveled in interstate commerce. *See Mitchell*, 2002 WL 1790467 at \*2; *Wesela*, 223 F.3d at 660. Nothing in *Jones* requires a different result.

**F.**

Fleischli next challenges his conviction under 26 U.S.C. § 5822. Presumably he means to challenge his conviction under 26 U.S.C. § 5861(f) which states that "[i]t shall be unlawful for any person to make a firearm in violation of the provisions of this chapter[.]" Section 5822, in turn, provides the scheme by which persons seeking to manufacture firearms may apply for permission to do so. Section 5822 provides that no person shall make a firearm unless he has filed a written application with the Secre-

tary, paid any appropriate taxes, identified the firearm on the application, identified himself on the application (a photograph and fingerprints must be included if the applicant is an individual), and obtained the approval of the Secretary to make and register the firearm. Section 5822 also provides "Applications shall be denied if the making or possession of the firearm would place the person making the firearm in violation of the law." Fleischli contends that section 5822 did not apply to him because he manufactured the gun in question under the auspices of SAS, a licensed manufacturer. Section 5822, he maintains, does not apply to licensed manufacturers but rather applies to non-licensed persons who wish to manufacture a machine gun. Because SAS was licensed under section 5802, it was not required to apply for approval under section 5822, and because Fleischli was employed by SAS, his manufacture of a machine gun could not be prosecuted under section 5822.

Fleischli does not cite a single case in support of this novel theory. It is essentially a replay of his argument that he is not subject to section 922(o)(1) because he was acting as the agent of a licensed manufacturer. We reject this claim here as we rejected it in section B above. First, SAS would not have obtained a license to manufacture guns if it had disclosed that Fleischli, a convicted felon, would be central to the operation. Second, Fleischli may not hide behind a corporate charter to engage in conduct he could not legally accomplish as an individual. Such a theory is contrary to the language and structure of the statutory scheme regulating firearms. If Fleischli's theory prevailed, a hypothetical "Felons, Inc." could provide convicted felon-employees with access to firearms they could not legally obtain, completely thwarting Congressional intent to keep firearms out of the hands of convicted felons. We do not believe Congress intended to create such a gaping loophole, and no statutory lan-

guage supports such an expansive reading. *McNamara*, 522 F.2d at 1165; *Gillespie*, 185 F.3d at 693; *Floyd*, 882 F.2d at 240. Indeed, section 5822 specifies that applications will be denied if the making or possession of a firearm would place the person making the firearm in violation of the law. As a convicted felon, Fleischli's application would be denied because possession of a gun would place him in violation of 18 U.S.C. § 922(g)(1). Fleischli's conviction under section 5861 will stand.

## G.

Fleischli challenges his convictions for possessing and manufacturing a machine gun on the ground that the minigun does not meet the statutory definition of a machine gun. In particular, he claims the minigun is not a machine gun as that term is defined in 26 U.S.C. § 5845(b) because the minigun does not fire automatically and does not have a trigger. Section 5845(b) defines a machine gun as follows:

> The term "machinegun" means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

26 U.S.C. § 5845(b). The words "automatic" and "trigger" are not defined in the statute or regulations. Fleischli argues that a gun does not fire automatically unless it uses a portion of the energy of a firing cartridge to ex-

tract the fired cartridge and chamber the next round without a separate pull of the trigger. He derives this meaning from the United States Code's definition of "semi-automatic." He also claims the minigun is akin to a Gatling gun, which is not considered a machine gun under an IRS ruling. Relying on firearms reference manuals, he also contends that his minigun lacked a trigger as that term is defined in the firearms field because the minigun operates by virtue of an electrical on-off switch.

In interpreting the National Firearms Act ("NFA"), the Supreme Court offered commonsense explanations of the terms "automatic" and "semiautomatic" that give us all the ammunition we need to dispose of Fleischli's disingenuous argument:

> As used here, the terms "automatic" and "fully automatic" refer to a weapon that fires repeatedly with a single pull of the trigger. That is, once its trigger is depressed, the weapon will automatically continue to fire until its trigger is released or the ammunition is exhausted. Such weapons are "machineguns" within the meaning of the Act. We use the term "semiautomatic" to designate a weapon that fires only one shot with each pull of the trigger, and which requires no manual manipulation by the operator to place another round in the chamber after each round is fired.

*Staples v. United States*, 511 U.S. 600, 602 n.1 (1994). Fleischli dismisses this passage as not binding, arguing that the Court did not define "automatically" but rather defined "automatic." We think the Court's meaning is plain enough. If Fleischli's minigun, with one application of the trigger, continued to fire until the trigger was released or the ammunition exhausted, it was a machine gun within the meaning of the Act.

That leads us to consider whether the minigun had a trigger. Fleischli's minigun was activated by means of

an electronic on-off switch rather than a more traditional mechanical trigger. He maintains that an electronic switch does not meet the traditional definition of trigger and that the minigun, which fired between 2000 and 6000 rounds per minute once it was switched on, was therefore not a machine gun. This is a puerile argument, based on hyper-technical adherence to literalism. We are not surprised to learn that Fleischli is not the first defendant to make such a brazen argument, although he appears to be the first to do so in this circuit. We join our sister circuits in holding that a trigger is a mechanism used to initiate a firing sequence. *United States v. Jokel*, 969 F.2d 132, 135 (5th Cir. 1992) (commonsense understanding of trigger is mechanism used to initiate firing sequence); *United States v. Evans*, 978 F.2d 1112, 1113-14 n.2 (9th Cir. 1992), *cert. denied*, 510 U.S. 821 (1993) (trigger is anything that releases the bolt to cause the weapon to fire). Fleischli's definition "would lead to the absurd result of enabling persons to avoid the NFA simply by using weapons that employ a button or switch mechanism for firing." *Evans*, 978 F.2d at 1113-14 n.2. The dictionary definition of "trigger" includes both the traditional ("a small projecting tongue in a firearm that, when pressed by the finger, actuates the mechanism that discharges the weapon") and the more general ("anything, as an act or event, that serves as a stimulus and initiates or precipitates a reaction or series of reactions."). *See* WEBSTER'S UNABRIDGED DICTIONARY OF THE ENGLISH LANGUAGE (2001). Fleischli's electronic switch served to initiate the firing sequence and the minigun continued to fire until the switch was turned off or the ammunition was exhausted. The minigun was therefore a machine gun as defined in the National Firearms Act.

## H.

We next consider whether the term "similar device" in 26 U.S.C. § 5845(f) is unconstitutionally vague. Fleischli

was convicted of violating section 5861(d), which prohibits possession of an unregistered firearm. Section 5845(a)(8) defines "firearm" to include a "destructive device." Section 5845(f), in turn, defines destructive device:

> The term "destructive device" means (1) any explosive, incendiary, or poison gas (A) bomb, (B) grenade, (C) rocket having a propellant charge of more than four ounces, (D) missile having an explosive or incendiary charge of more than one-quarter ounce, (E) mine, or (F) similar device[.]

26 U.S.C. § 5845(f). The statute further provides that the term "destructive device" does not include devices that are not designed or redesigned for use as weapons. 26 U.S.C. § 5845(f)(3). Fleischli was charged with possessing four "explosive or incendiary bombs or similar devices each consisting of a cardboard container sealed at both ends, containing a mixture of pentaerythritol tetranintrate (PETN) powder, a non-electric blasting cap with a short length of fuse." R. 26 at 7. Fleischli maintains that the use of the word "similar" causes a reasonable person to speculate as to how nearly a device must resemble a bomb, grenade, rocket, missile or mine in determining whether the device is encompassed by the statute. Fleischli thus contends the statute is unconstitutionally vague.

The three circuits to consider this issue have all found that the statute is not unconstitutionally vague. *See United States v. Markley*, 567 F.2d 523, 527-28 (1st Cir. 1977), *cert. denied*, 435 U.S. 951 (1978); *United States v. Ross*, 458 F.2d 1144, 1145 (5th Cir. 1972), *cert. denied*, 409 U.S. 868 (1972); *United States v. Morningstar*, 456 F.2d 278, 281 (4th Cir. 1972), *cert. denied*, 409 U.S. 896 (1972). All three courts agreed that a person of ordinary intelligence would understand the statute to include any combination of parts intended to be used as a bomb or weap-

on or from which a bomb or weapon could be readily assembled. Fleischli's device comes well within the purview of the statute. He maintains, however, that the four devices he was charged with possessing were not intended for use as weapons but rather as fireworks. He complains that the jury was not instructed that the government was required to prove the devices were designed or redesigned for use as a weapon.

The jury was instructed as follows:

> You must determine whether any of the devices charged in Count 6 is a destructive device. If the objective design of the device indicates that the object has no legitimate social or commercial purpose, the defendant's intent in possessing that device is not relevant to your determination. However, if the assembled device may form an object with both a legitimate and a nonlegitimate use, then you may consider the defendant's subjective intent in deciding whether that device qualifies as a destructive device.

R.81, Tr. at 461. This instruction was a correct statement of the law in this circuit, and allowed Fleischli to proceed with his defense that the objects were actually fireworks, not destructive devices. *See United States v. Saunders*, 166 F.3d 907, 914 (7th Cir. 1999); *United States v. Johnson*, 152 F.3d 618, 625 (7th Cir. 1998). The jury simply did not believe his version of events. The statute gave adequate notice of what conduct was proscribed, and the jury was properly instructed about the government's burden of proof. We find no error.

## I.

Fleischli next raises a sufficiency of the evidence challenge, arguing that the government failed to prove that

the four devices were designed or redesigned for use as weapons. He claims that the undisputed evidence shows that the devices were intended for use as fireworks at the Tobiases' farm. Fleischli's in-laws apparently held a valid fireworks permit. Fleischli has an uphill battle in making out a sufficiency of the evidence claim. In reviewing this claim we must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *United States v. Copus*, 93 F.3d 269, 271 (7th Cir. 1996). We may reverse a conviction only when the record is devoid of any evidence, regardless of how it is weighed, from which a jury could find guilt beyond a reasonable doubt. *Id.*

The government presented evidence that Fleischli possessed four fully assembled devices consisting of blasting caps (detonators), varying amounts of PETN (a highly explosive powder), and fuses. Government evidence demonstrated that lighting the fuse would cause the blasting cap to activate, which in turn would detonate the explosive powder. The resulting explosion was of sufficient force to damage property and cause personal injury. In response to Fleischli's claim that the devices were intended for use as fireworks, an ATF explosives expert testified that no commercial firecrackers of which he was aware used a detonator or PETN. The ATF expert testified that he knew of no social or commercial use for the devices as assembled. This evidence was more than adequate to support a conviction under section 5861(d).

## J.

Fleischli was convicted of transporting firearms in interstate commerce in violation of 18 U.S.C. § 922(g)(1). The district court here instructed the jury that a "defendant transports a firearm when he transports or causes

to be transported the firearm in a vehicle." R. 81, Tr. at 458. The charge was based on the transport of the minigun from Illinois to Missouri in the Spring of 1998. The gun was transported in a trailer that was towed by a van owned and driven by Kevin Traeger. Fleischli and his family were passengers in Traeger's van. Fleischli cites *Muscarello v. United States*, 524 U.S. 125 (1998), for the proposition that the driver of the vehicle was the only person legally liable for transporting the firearms. Because Fleischli was merely a passenger in the van in which the minigun was transported, he maintains he did not "transport" the gun. He does not dispute that, as a factual matter, he agreed to bring his minigun to Missouri to attend a shooting event, that the minigun was loaded into Traeger's trailer at Otto American Boiler, that Fleischli demonstrated the gun in Missouri, and that the gun was returned to the safe at Otto American Boiler at the end of the day.

In *Muscarello*, the Court considered the meaning of "carry" as that term is used in 18 U.S.C. § 924(c)(1). The Court concluded that "carry" is not limited to the carrying of weapons directly on the person but can include their carriage in a car. 524 U.S. at 132. According to the Court, a person may "carry" firearms in a wagon, truck, car or other vehicle that one accompanies. 524 U.S. at 128. The Court rejected the petitioner's claim that such a broad definition of "carry" would make it equivalent to "transport," which clearly had a separate meaning in the statute. The Court commented that "carry" implies personal agency and some degree of possession, "whereas 'transport' does not have such a limited connotation, and, in addition, implies the movement of goods in bulk over great distances." 524 U.S. at 134. "'Transport' is a broader category that includes 'carry' but also encompasses other activity." 524 U.S. at 135.

There is no support in the language of the statute or the case law for Fleischli's distinction between a passenger and driver of the vehicle in which the firearm is transported. Under *Muscarello*, the key to the meaning of "carry" is personal agency and possession. "Transport" includes "carry" and is a broader category. The evidence demonstrated that the gun belonged to Fleischli, that it was transported to Missouri at his impetus, that he accompanied the gun in a van to Missouri and oversaw the loading and unloading of the gun at both ends of the trip. In short, he transported the gun to Missouri as that word is commonly understood. The government was required to prove no more than that. The district court's instruction accurately conveyed the law by clarifying that the standard could be met by showing that Fleischli caused the firearm to be transported.

## K.

Over Fleischli's objection, the government offered evidence of Fleischli's possession of firearms in Missouri. Fleischli contends that this evidence violated his Sixth Amendment right to be tried in the district where the crime was committed. Possession of a firearm is a continuing offense which ceases only when the possession stops. *United States v. Ballentine*, 4 F.3d 504, 507 (7th Cir. 1993), *cert. denied*, 510 U.S. 1179 (1994). Continuing offenses may be prosecuted in any district in which they occurred. *United States v. Chin*, 981 F.2d 1275, 1278 (7th Cir. 1992), *cert. denied*, 508 U.S. 923 (1993). Thus, Fleischli was properly prosecuted for possession in either Illinois or Missouri, and the court did not err by admitting evidence of Fleischli's gun-related activities in Missouri. Moreover, Fleischli was also charged with transporting a gun from Illinois to Missouri and evidence of his possession of the gun in Missouri was highly relevant to that charge and appropriately admitted.

**L.**

Finally, Fleischli contests his sentence, arguing that the district court incorrectly applied an enhancement for his role in the offense pursuant to U.S.S.G. §3B1.1(c). That provision allows a court to increase the defendant's offense level by two levels if the defendant was an organizer, leader, manager, or supervisor in any criminal activity. Fleischli contends that this enhancement may be applied only when the offense is committed by more than one participant. Because "participant" is defined as a person who is criminally responsible for the commission of the offense (regardless of whether that person is convicted), and there were no other criminally responsible persons, Fleischli argues that the district court erred in applying the enhancement. Fleischli is correct that a section 3B1.1(c) enhancement may be applied only when there is another participant in the offense. *United States v. Mustread*, 42 F.3d 1097, 1103 (7th Cir. 1994); U.S.S.G. 3B1.1, Application Note 2 ("To qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants."). The district court was aware of this limitation, and declined to apply an adjustment under section 3B1.1(c). Instead the court departed upward, relying on additional language from Application Note 2:

> An upward departure may be warranted, however, in the case of a defendant who did not organize, lead, manage, or supervise another participant, but who nevertheless exercised management responsibility over the property, assets, or activities of a criminal organization.

U.S.S.G. § 3B1.1, Application Note 2.

In particular, the court referenced Application Note 2 and then noted:

> And here the government clearly established at trial that the defendant procured parts for illegal weapons and engaged in illegal weapons manufacture. He arranged for potential sale of the Minigun. He demonstrated its firepower at a gun show. And he had Mr. Tobias register arms and conduct transactions in his stead. Similarly, Mr. Fleischli employed Mr. Medlock as the firearm company's secretary-treasurer because Mr. Medlock had a valid firearm owner identification card, FOID card, and could use it to possess guns which the defendant could not legally possess himself. So these activities, it seems to the Court, clearly warrant a two-point upward departure pursuant to 3B1.1.

R.79, Sentencing Tr. at 8-9. The court had already found that it was Fleischli's idea to set up the corporation after repeated attempts to gain access to firearms legally had failed.

We review the court's decision to depart upward from the applicable Guideline range for abuse of discretion. *United States v. Leahy*, 169 F.3d 433, 439 (7th Cir. 1999). We see no abuse of discretion here. Fleischli set up a sham corporation using friends and relatives to help him gain access to firearms he could not obtain legally. He recruited others to act as straw men in his gun purchase activities, and directed the operation himself. He maintained in his own home and business a veritable arsenal of weapons that were registered to this company, exercising management responsibility over the property, assets, or activities of a criminal organization. We therefore affirm the district court's application of an upward departure to Fleischli's sentence.

### III.

For the reasons stated above, we find no error in Fleischli's conviction or sentence. We therefore affirm the judgment of the district court.

AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*